**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ANONOS INNOVATIONS LLC,

*Plaintiff*,

v.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

*Defendant*.

Case No. 2:26-cv-00594

**JURY TRIAL DEMANDED**

**DEFENDANT JPMORGAN CHASE BANK, NATIONAL ASSOCIATION'S RENEWED MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....1

II. LEGAL STANDARD....2

A. Failure to State a Claim....2

B. Patent Eligibility ....2

III. PROCEDURAL HISTORY....3

IV. BACKGROUND ON THE ASSERTED PATENTS....4

A. The ’215 Patent....6

B. The ’216 Patent....7

C. The ’133 Patent....8

D. Claim 1 of the ’215 Patent Is Representative....9

V. THE CHALLENGED CLAIMS FAIL TO COMPLY WITH 35 U.S.C. § 101....11

A. *Alice* Step One: The Challenged Claims Are Directed to an Abstract Idea....11

1. The Asserted Patents Are Directed to the Abstract Idea of Substituting Time-Varying Codes for a Person’s Identity....11

2. The Federal Circuit Already Addressed the Eligibility of Materially Identical Claims in *Universal Secure Registry*....14

3. The Claims Recite Functional Results, Not Improvements in Computer Technology ....16

4. The Differences in the Claims Do Not Affect the Step One Analysis....18

5. Conclusory Allegations and Allegations that Contradict the Challenged Claims Do Not Change the Step One Analysis ....20

B. *Alice* Step Two: The Challenged Claims Lack Any Inventive Concept....23

1. The Claims Recite Generic Components Performing Ordinary Functions....23

2. Abstract Ideas Cannot Supply the Inventive Concept ....24

3. Anonos’s Allegations of Unconventionality Are Unavailing....26

4. The Remaining Claims Supply No Inventive Concept....29

C. Claim Construction Would Not Affect the *Alice* Analysis....29

VI. CONCLUSION....30

# TABLE OF AUTHORITIES

## Cases


**Page(s)**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014)....11, 19, 23, 24, 29

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016)....14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....2

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012)....29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....2

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....9

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024)....12

*BSG Tech LLC v. BuySeasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)....11

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019)....23, 25

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)....9, 19

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F. App'x 529 (Fed. Cir. 2020)....13, 26

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)....16

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....17

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020)....25

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026)....11, 16, 18

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)....13, 19

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)....24

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)....23

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021)....23

*Preservation Wellness Techs. LLC v. Allscripts Healthcare Sols.*,
No. 2:15-CV-1559-WCB, 2016 WL 2742379 (E.D. Tex. May 9, 2016)....14

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
696 F. App'x 1014 (Fed. Cir. 2017)....13, 23, 29

*Rothschild Location Techs. LLC v. Geotab USA, Inc.*,
No. 6:15-cv-682-RWS-JDL, 2016 WL 3584195 (E.D. Tex. Jan. 4, 2016)....29

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)....24

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)....13

*Torus Ventures LLC v. Cawley Partners, LLC*,
No. 2:24-CV-00552-JRG, 2025 WL 1799327 (E.D. Tex. June 30, 2025)....17, 25

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023)....26

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017)....17, 25

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021)....1, 11, 13, 14, 15, 18, 19, 25

**Statutes**

35 U.S.C. § 101....1, 2, 11, 14, 16, 29

**Rules**

Rule 12(b)(6)....2, 15, 26

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| ’133 patent | U.S. Patent No. 9,129,133 |
| ’215 patent | U.S. Patent No. 9,087,215 |
| ’216 patent | U.S. Patent No. 9,087,216 |
| ’539 patent | U.S. Patent No. 8,856,539 (at issue in Universal Secure Registry) |
| ’813 patent | U.S. Patent No. 8,577,813 (at issue in Universal Secure Registry) |
| ’826 patent | U.S. Patent No. 9,100,826 (at issue in Universal Secure Registry) |
| ’137 patent | U.S. Patent No. 9,530,137 (at issue in Universal Secure Registry) |
| Amended Complaint or Am. Compl. | Amended Complaint for Patent Infringement, Dkt. No. 31 (October 16, 2026) |
| Anonos | Plaintiff Anonos Innovations LLC |
| asserted patents | U.S. Patent Nos. 9,087,215, 9,087,216, and 9,129,133 |
| Complaint | Complaint for Patent Infringement, Dkt. No. 1 (July 17, 2026) |
| DDID | dynamically changing de-identifiers |
| Joint Letter | Joint Letter following JPM’s Motion to Dismiss for Failure to State a Claim, Dkt. No. 28 (October 5, 2026) |
| JPM | Defendant JPMorgan Chase Bank, National Association |

# I. INTRODUCTION

JPM respectfully requests that the Court dismiss the Amended Complaint in full because the claims of all three asserted patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101. Anonos accuses JPM of infringing three related patents: the ’215, ’216, and ’133 patents. The patents share a specification and claim one idea: a “data subject” (*e.g.*, a person) is represented by a temporary code that changes over time, so that whoever receives the code can use data associated with that person without learning who the person is. The Federal Circuit has already held that exact idea abstract. In *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342 (Fed. Cir. 2021), the court held abstract claims that provided a merchant “a time-varying code instead of the user’s secure (credit card) information,” enabling access to “a database that indicates any restrictions on the user’s transactions . . . without the provider gaining access to the secure information.” *Id.* at 1349. The claims here address the same idea: their “dynamically-changing, temporally unique identifiers” mirror the time-varying codes of *Universal Secure Registry*, and their “data subject” is the user whose identity remains concealed, even as information about the user is accessible. The claims are thus directed to an abstract idea under *Alice* step one.

*Universal Secure Registry* also answers *Alice* step two. The court held that generating time-varying codes was, as the patent itself acknowledged, “conventional and long-standing,” and that routing data through a third party “is itself an abstract idea” that “cannot serve as an inventive concept.” *Id.* at 1350. Here, the claims add nothing more than a generic “communication interface,” “memory elements,” and “processing units” that generate, receive, associate, store, and send data, and nothing in the claims improves how a computer performs any of those functions.

Although Anonos amended its Complaint in response to JPM’s original motion to dismiss—adding 46 paragraphs attempting to preempt an ineligibility determination—nothing in Anonos’s allegations changes the result. To the contrary, in its allegations Anonos now concedes

that both time-varying codes and reusable identifiers were conventional. Anonos attempts to distinguish its claims from *Universal Secure Registry* on the basis that the claimed codes here are stored rather than discarded after a single use, such that they can be used to access information associated with the person over time. Even if Anonos were correct in its understanding of *Universal Secure Registry* (it is not), that distinction is engulfed completely by the abstract idea. It is not a technological advance sufficient to save the asserted patents from ineligibility. Because every claim is directed to an abstract idea and recites no inventive concept, the asserted patents are ineligible under Section 101, and Anonos's infringement claims should be dismissed.

## II. LEGAL STANDARD

### A. Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Federal Circuit and this Court have recognized that patent eligibility can be determined at the motion to dismiss stage. *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360 (Fed. Cir. 2023) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage . . . .").

### B. Patent Eligibility

The Supreme Court has articulated a two-step test for examining patent eligibility under Section 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). Step one asks whether the claims are directed to an ineligible "concept[]," such as an "abstract idea." *Id.* at 217. More specifically, the inquiry "ask[s] what the patent asserts to be the focus of the claimed advance over the prior art," and whether that focus is on patent-ineligible subject matter, such as an abstract idea. *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021); *Affinity Labs of Tex., LLC v. DirecTV,*

*LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (step one seeks "to determine if the claim's 'character as a whole' is directed to excluded subject matter"). The analysis at step one "must focus on" the claim language. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019). Claims that "simply call for the use of computers and networks as tools to carry out an abstract idea, using their ordinary functions without specific hardware or process advances in those functions—*e.g.*, receiving inputs, storing and retrieving, processing, outputting (including displaying), and transmitting"—are directed to an abstract idea. *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064 (Fed. Cir. 2026).

If the claims are directed to an abstract idea, step two asks whether the claims nevertheless recite a specific "inventive concept" that "amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18. A claim does not pass step two through "use [of] functional, result-focused language" or "encompass[ing] ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea." *GoTV Streaming*, 166 F.4th at 1067. If the claims merely implement the idea using well-understood, routine, and conventional components previously known in the industry, they lack the inventive concept required for patent eligibility. *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018).

## III. PROCEDURAL HISTORY

On July 17, 2026, Anonos filed its initial Complaint. Dkt. No. 1. JPM filed a motion to dismiss for failure to state a claim on September 25, 2026. Dkt. No. 23. The parties then submitted the Joint Letter required by the Court's Standing Order Regarding Motions Under 35 U.S.C. § 101. Dkt. No. 28. Subsequently, on October 16, 2026, Anonos filed an Amended Complaint, adding 46 paragraphs (¶¶ 13–58) alleging "the asserted patents claim patent-eligible subject matter." Dkt. No. 31. JPM now renews its motion to dismiss the Amended Complaint for failure to state a claim.

## IV. BACKGROUND ON THE ASSERTED PATENTS

Anonos asserts three related patents, all of which share a specification: U.S. Patent Nos. 9,087,215 ("the '215 patent"), 9,087,216 ("the '216 patent"), and 9,129,133 ("the '133 patent") (collectively, the "asserted patents"). Am. Compl. ¶¶ 1, 10–12 & Exs. 1–3. The '216 and '133 patents issued directly from continuations of the application that became the '215 patent.

The asserted patents are each titled "Dynamic De-Identification and Anonymity" and "relate[] generally to improving data security, privacy, and accuracy, and, in particular, to using dynamically changing identifiers to render elements of data anonymous." '215 patent, 2:3–6.[1] The stated goal is to allow the subject to whom data pertains (a "Data Subject") to "remain 'dynamically anonymous,' i.e., anonymous for as long as is desired—and to the extent that is desired." *Id.*, 4:6–9. The specification identifies the problem as the prior art's use of identifiers that were "statically assigned and persist over time" and so could be "tracked, identified, and cross-referenced to ascertain true identities." *Id.*, 3:12–21. The asserted patents propose a "temporally unique, dynamically changing de-identifier" (or "DDID") that is "associated with a subject, e.g., a person, place, or thing, to which data directly or indirectly pertains or relates . . . for a temporally unique period of time, thereby enabling the Data Subject to operate in a 'dynamically anonymous' manner." *Id.*, 4:25–32. When a DDID serves as a Data Subject's "primary identifier," "no two extant Data Subjects can have identical primary identifier DDIDs at the same time." *Id.*, 5:52–58.

The specification describes a client-server architecture in which a "privacy server" provides services to one or more "privacy clients," which "may reside on a Data Subject device, on a service provider device, . . . or reside on the same computing device as the privacy server," and in which the associations between DDIDs and Data Subjects are "stored in a database on a

---

[1] Because the specifications of the three asserted patents are materially the same, JPM cites to the '215 patent throughout this brief.

hard drive or other memory element associated with the privacy server." *Id.*, 10:26–41. As explained below, the '215 and '133 patents claim the server side of that arrangement; the '216 patent claims the client side.

In plain terms, each independent claim describes the same sequence. A system obtains two or more temporary identifiers, or DDIDs, that will stand in for a "Data Subject" (*e.g.*, person). It assigns those identifiers to the person and records when each identifier stands in for the person. The identifier used in one time period is not used to identify the person in the other time period, "thereby providing anonymity" to the person. The system stores the identifiers and the time period data in memory. And it transmits data over a communication interface: the identifiers (the '215 patent), the data attributes tied to an identifier (the '133 patent), or the identifiers, their time period data, and their attributes to a "privacy server" once a "condition" is met (the '216 patent).

Because the claims of each asserted patent recite the same core elements and the eligibility analysis turns on what those elements are and on how they compare to claims the Federal Circuit has already held abstract, this brief color-codes each asserted claim element at issue. The three core elements are: (1) generating and providing dynamically-changing, temporally unique identifiers, including characteristics of the identifiers (such as the fact that two identifiers are different) (**green**); (2) associating the identifiers with a data subject (*e.g.*, a person) and/or data attributes (**blue**); and (3) generating and using time period data defining the separate time periods during which each identifier is used to identify the data subject and/or its data attributes, such that neither identifier is used during the other's period (**purple**). The remaining elements **(red)** recite conventional computer components, such as a communication interface, processing units, and memory, which carry out conventional steps such as sending, receiving, and storing information.

### A. The '215 Patent

The '215 patent contains 30 claims. Claims 1 and 12 are independent. Claim 1, the claim JPM allegedly infringes (Am. Compl. ¶¶ 90, 93), recites:

> 1. A system, comprising:
>
> a communication interface for sending data;
>
> one or more memory elements having, stored therein, computer program code; and
>
> one or more processing units operatively coupled to the one or more memory elements and configured to execute instructions in the computer program code that cause the one or more processing units to:
>
> generate or receive two or more dynamically-changing, temporally unique identifiers;
>
> receive a first request from a first client for two or more dynamically-changing, temporally unique identifiers related to a first data subject;
>
> associate, in response to the first request, two or more dynamically-changing, temporally unique identifiers with the first data subject;
>
> generate first time period data, wherein the first time period data comprises information defining a first time period during which a first one of the two or more dynamically-changing, temporally unique identifiers associated with the first data subject is used to identify the first data subject;
>
> generate second time period data, wherein the second time period data comprises information defining a second time period during which a second one of the two or more dynamically-changing, temporally unique identifiers associated with the first data subject is used to identify the first data subject,
>
> wherein the first time period is different from the second time period,
>
> wherein the first dynamically-changing, temporally unique identifier is different from the second dynamically-changing, temporally unique identifier,
>
> wherein the first dynamically-changing, temporally unique identifier is not used to identify the first data subject during the second time period, and
>
> wherein the second dynamically-changing, temporally unique identifier is not used to identify the first data subject during the first time period, thereby providing anonymity to the first data subject;
>
> store, in at least one of the one or more memory elements, the two or more dynamically-changing, temporally unique identifiers and the first and second time period data; and
>
> send the two or more dynamically-changing, temporally unique identifiers to the first client.

’215 patent, cl. 1 (emphasis added). Independent claim 12 recites the same steps as computer-executable instructions stored on a “non-transitory computer readable medium.” *Id.*, cl. 12.

The dependent claims add limitations of varying types:

- claims 2–3, 9–10, 13–14, and 24–25 associate “data attributes”—such as information about an “action, activity, process, purpose, identity, or trait” of the data subject—with an identifier;
- claims 4, 6, 16, 18, and 28–29 add a second client that requests the attributes or the identity behind an identifier, a determination that the request “is authorized,” and a grant and later revocation of the second client’s ability to obtain them;
- claims 5, 7, 17, 19, and 20 reuse the first identifier for a second data subject, either during a third time period or during the first or second period;
- claims 8, 11, 21, and 26 add a third identifier, which may be the same as the first (claims 8 and 21) or may be received from a second client for a second data subject (claims 11 and 26);
- claims 22 and 23 specify that the first and second time periods “do not overlap” or “at least partially overlap”;
- claim 27 specifies that the third identifier “comprises a Hypertext Transfer Protocol (HTTP) cookie”; and
- claims 15 and 30 specify that the first identifier “is not derived from any of the one or more data attributes” and that it “comprises a primary identifier for the first data subject.”

’215 patent, cls. 2–11, 13–30.

## B. The ’216 Patent

The ’216 patent contains 30 claims. Claims 1, 11, and 21 are independent. The ’216 patent claims the same exchange as the ’215 patent, but from the other side. Where claim 1 of the ’215 patent recites the system that issues identifiers in response to a client’s request, claim 1 of the ’216 patent recites the client: a “device” that requests two identifiers “from a first privacy server”; associates each identifier with the data subject and with a set of the subject’s data attributes; generates the same first and second time period data; stores the identifiers, attributes, and time period data; and sends each identifier, with its time period data and attributes, back to the privacy server “in response to a determination that a . . . condition has been met.” ’216 patent, cl. 1.

Independent claim 11 recites the same steps as instructions on a "non-transitory computer readable medium," with the data stored "in at least one or more memory elements of a first client device." *Id.*, cl. 11. Independent claim 21 recites a "device" that obtains a first identifier from the privacy server; associates data attributes with it; generates first time period data; stores and sends that information to the privacy server; and then receives from the privacy server a second identifier that the server has associated with the same data subject during a second time period, subject to the same limitations that the two identifiers differ and that neither is used to identify the data subject during the other's time period. *Id.*, cl. 21.

The dependent claims add limitations of the same kinds found in the '215 patent. For example, claims 2, 12, 22, and 23 define the "condition" that triggers a transmission (*e.g.*, passage of time, expiration of the identifier's "purpose," or a change in the data subject's "location"); claims 3–5, 7, 13–15, 17, and 24–26 modify, track, revoke, or synchronize the attributes tied to an identifier; claims 8–10 and 18–20 specify the identifier's form, including "an Hypertext Transfer Protocol (HTTP) cookie," or content; claims 6 and 16 place the device on the privacy server; and claims 27–30 require "confirmation" from the privacy server before identifying information is "revealed to a first requesting party." '216 patent, cls. 2–10, 12–20, 22–30.

**C. The '133 Patent**

The '133 patent contains 26 claims, two of which (claims 1 and 14) are independent. The '133 patent returns to the server side. Its independent claims (one drawn to a system and one to a non-transitory computer readable medium) track those of the '215 patent with four differences: the system need not receive a request from the client before associating the identifiers with the data subject; it associates "one or more data attributes" with the first identifier; the first time period is the period during which the first identifier is used both to identify the data subject and to "retrieve the associated one or more data attributes"; and what the system sends to the client is "the one or

more data attributes" rather than the identifiers. '133 patent, cls. 1, 14.

The dependent claims of the '133 patent likewise track those of the '215 patent. Claims 2–4 and 15–17 generate the identifier, or end its ability to retrieve attributes, based on at least one of time, purpose, and location; claims 5 and 18 define the data attributes; claims 6–7 and 19–20 reuse the first identifier for a second data subject; claims 8–11 and 21–24 add a second client's request, a determination that it "is authorized," and a grant and revocation of access; and claims 12–13 and 25–26 specify that the identifier is "not derived from" its attributes and is a "primary identifier." '133 patent, cls. 2–13, 15–26.

**D. Claim 1 of the '215 Patent Is Representative**

Claim 1 of the '215 patent is representative of the claims of the asserted patents ("the challenged claims"). A court may treat one claim as representative when, as here, the claims are "substantially similar and linked to the same abstract idea," *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014), and the patentee offers no "meaningful argument for the distinctive significance of any claim limitations not found in the representative claim," *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Every independent claim of the three asserted patents recites the same core concept. Each requires two or more "dynamically-changing, temporally unique identifiers"; their association with a "first data subject"; "first time period data" and "second time period data" defining when each identifier "is used to identify the first data subject" respectively; the requirements that the two periods differ, that the two identifiers differ, and that neither identifier is used to identify the data subject during the other's period, "thereby providing anonymity"; storage of the identifiers and time period data in memory; and transmission of data through a communication interface. *See* '215 patent, cls. 1, 12; '216 patent, cls. 1, 11, 21; '133 patent, cls. 1, 14.

The differences among the independent claims do not matter to eligibility. First, the claims are drawn to a "system," "device," or "non-transitory computer readable medium." The Supreme Court in *Alice* held system and media claims ineligible for the same reason as the method claims—they "add nothing of substance to the underlying abstract idea." 573 U.S. at 226–27. Second, the '215 and '133 patents claim the system that issues and records the identifiers, while the '216 patent claims the client device that requests them from a "privacy server" and returns them, with their time period data and attributes, when a condition is met. Both sides of a single exchange—issuing a code, recording it, and returning it—embody the same idea. Third, the claims differ in what the computer transmits—the identifiers (the '215 patent), the attributes tied to an identifier (the '133 patent), or the identifiers, time period data, and attributes (the '216 patent)—and in whether any attributes are associated with the identifiers. Sending one category of stored data rather than another is a choice about the content of a message, not about how a computer sends it.

Anonos implicitly admits that asserted claim 1 of the '215 patent is representative. In its Amended Complaint, Anonos bundles the claims of all three asserted patents together, contending that the asserted patents "share a common specification," address the same technical problem, recite the same "claimed data structure" (Anonos's inaccurate label, addressed below), and recite similar elements. Am. Compl. ¶¶ 19–20, 38, 44, 53. Anonos nonetheless contends that claim 1 of the '215 patent is not representative because the asserted '216 and '133 claims tie an identifier's time period to the "retrieval" of the data attributes associated with it and, in the '216 patent, send each identifier with its time period data and attributes to a privacy server when a condition is met. *Id.* ¶¶ 55–58. But that is not a "meaningful argument for the distinctive significance" of those limitations. *Berkheimer*, 881 F.3d at 1365. The abstract idea is not changed by storing a different time period or by changing the server to which the identifier is sent. *See id.* The limitations added

by the dependent claims do not change the nature of the claims at either step of the *Alice* inquiry. JPM therefore presents claim 1 of the '215 patent as representative but, in any event, directly addresses any differences where a claim differs in any way Anonos contends is material. *See generally* Joint Letter.

## V. THE CHALLENGED CLAIMS FAIL TO COMPLY WITH 35 U.S.C. § 101

### A. *Alice* Step One: The Challenged Claims Are Directed to an Abstract Idea

*Alice* step one asks what the claims, read as a whole, are "directed to." 573 U.S. at 217–18. Here the answer follows directly from the claim language (including as construed by Anonos in the Joint Letter): the claims are directed to the abstract idea of substituting time-varying codes for a person's identifying information, such that information associated with the person can be accessed and used while maintaining the person's anonymity. That is the idea the Federal Circuit held abstract in *Universal Secure Registry*: using "a time-varying code instead of the user's secure (credit card) information," such that the "time-varying code is used to access a database that indicates any restrictions on the user's transactions," in order "to approve or deny the transaction based on the secure information without the provider gaining access to the secure information." 10 F.4th at 1349. The same result should follow here.

#### 1. The Asserted Patents Are Directed to the Abstract Idea of Substituting Time-Varying Codes for a Person's Identity

The claims are directed to substituting time-varying codes for a person's identifying information in order to provide anonymity. Stripped of the generic hardware that carries it out (*e.g.*, "a communication interface," "processing units," and "memory elements"), claim 1 of the '215 patent recites five steps: obtain two or more codes that will stand for a person; assign the codes to the person; record when each code stands for the person, such that the code used in one period is not used in another time period; store the codes and their time periods; and provide the codes. '215 patent, cl. 1. The claim states its own purpose: the codes are swapped over time

"thereby providing anonymity to the first data subject." *Id.*; *see also* '215 patent, cl. 12; '216 patent, cls. 1, 11, 21; '133 patent, cls. 1, 14. As construed by Anonos, the claims further require a "retained association linking both identifiers to the data subject." Joint Letter at 3. Even crediting Anonos's construction, this is an abstract idea, not an inventive machine or a technique, and it is as old as the pseudonym and the numbered account: a person deals with others under a name or number that is not the person's own, changes it from time to time, and leaves the key or mapping with someone the person trusts. "A claimed method's similarity to 'fundamental . . . practices long prevalent' is yet another clue that the claims may be abstract and unpatentable." *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1356 (Fed. Cir. 2024).

The specification confirms that the claimed advance lies in this abstract idea rather than in any specific implementing technology. It describes the disclosure as "using dynamically changing identifiers to render elements of data anonymous," '215 patent, 2:3–6, identifies the shortcoming of the prior art as identifiers that were "statically assigned and persist over time," *id.*, 3:13–20, and calls the DDID a "temporally-bounded pseudonym which both refers to and obscures the value of" the identity or attribute it replaces, *id.*, 23:30–37. It defines "dynamically changing" and "temporally unique" by what the identifier does—it changes after a period of time, upon expiration of a purpose, or upon a change of location, and its time of assignment "is known"—not by how any of that is accomplished. *Id.*, 13:66–14:20.

The specification is equally clear that the point of the identifiers is privacy. The goal is to "maintain flexible levels of privacy and/or anonymity under the control of a Data Subject or controlling entity that may be a trusted party or proxy," *id.*, 4:38–42, so that "control over the collection of data . . . would reside with the Data Subject or other controlling entity, rather than with the websites visited by the Data Subject," *id.*, 6:53–57. Protecting anonymity by controlling who may learn a person's identity is the end the patents serve; substituting changing codes for

identifying information is the functional means for doing so. Both are abstract.

Anonos's Amended Complaint repeatedly describes the patents the same way. It does not claim an advance in computing but, rather, describes the patented technology as "de-identification" and "pseudonymization"—*i.e.*, replacing identifying information with a stand-in so that sensitive data can be used without revealing the person to whom it belongs:

- "Anonos data-privacy presentation addressing the de-identification and pseudonymization of personal data . . . ." Am. Compl. ¶ 64.
- "Anonos presented its pseudonymization and de-identification technology." *Id.* ¶ 66.
- "The subject matter of these interactions, including the advanced de-identification, pseudonymization, and tokenization of sensitive data, relates directly to the subject matter of the Asserted Patents." *Id.* ¶ 70.

"De-identification" and "pseudonymization" are names for the same abstract operation: replacing a person's identifying information with a substitute value so that the person cannot be identified from the data. Anonos's own account of its patents thus confirms abstractness.

However articulated, the concept to which the claims are directed is one courts have held abstract. In *Universal Secure Registry*, the Federal Circuit held that using "a time-varying code instead of the user's secure (credit card) information" so that information necessary to determine whether a transaction should proceed can be accessed "without the provider gaining access to the secure [credit card] information" is an abstract idea. 10 F.4th at 1349. And the means of providing that anonymity—controlling who may learn a person's identity or data—is itself an abstract idea. The Federal Circuit has held "providing restricted access to resources" and controlling access to data to be abstract, *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017) (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016); *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015)); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 532–33 (Fed. Cir. 2020).

Likewise, this Court has held that "the concept of record access and management is an abstract idea," that "[t]he introduction of computers for storing the records, providing remote access to them, and controlling access based on eligibility does not render the otherwise abstract idea any less abstract," and that "[a]llowing for secure and private access to data has also been found to be an abstract concept." *Preservation Wellness Techs. LLC v. Allscripts Healthcare Sols.*, No. 2:15-CV-1559-WCB, 2016 WL 2742379, at *7, *9 (E.D. Tex. May 9, 2016) (collecting cases); *see also Berkheimer*, 881 F.3d at 1366–67 (holding "parsing, comparing, and storing data" are abstract ideas); *Content Extraction*, 776 F.3d at 1347 ("[T]he claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory. The concept of data collection, recognition, and storage is undisputedly well-known."). Whether described by the means they recite or by the end they purportedly achieve, the claims are directed to an abstract idea.

### 2. The Federal Circuit Already Addressed the Eligibility of Materially Identical Claims in *Universal Secure Registry*

The Federal Circuit has instructed that "the decisional mechanism" to apply for determinations under Section 101 "is to examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016). Under that decisional mechanism, the conclusion that the claims are directed to an abstract idea is compelled by the Federal Circuit's decision in *Universal Secure Registry*.

The patents in *Universal Secure Registry* were directed to "securing electronic payment transactions." 10 F.4th at 1345. Representative claim 22 of the '539 patent (at issue in *Universal Secure Registry*) recited a method in which each user "is identified by a time-varying multicharacter code," and a registry holding the user's real information could be accessed using

the code, so as to allow access to the information necessary to approve or deny a transaction "without the provider's knowledge of the account identifying information." *Id.* at 1348–49. The district court, on a Rule 12(b)(6) motion, described the claim at issue in *Universal Secure Registry* as six steps (annotated below in the four colors defined in Section IV):[2]

> (1) "receiving" a transaction request with a time-varying multicharacter code and "an indication of" the merchant requesting the transaction; (2) "mapping" the time-varying multicharacter code to the identity of the customer in question; (3) "determining" whether the merchant's access to the customer's secure data complies with any restrictions; (4) "accessing" the customer's account information; (5) "providing" the account identifying information to a third party without providing that information to the merchant; and (6) "enabling or denying" the merchant to perform the transaction without obtaining knowledge of the customer's identifying information.

*Id.* The Federal Circuit found the claims ineligible because they "simply recite conventional actions in a generic way" and "do not purport to improve any underlying technology." *Id.*

The claims here recite the same idea. Claim 1 of the '215 patent recites a system that obtains two or more "dynamically-changing, temporally unique identifiers," associates them with a "data subject" at a client's request, records "time period data" when each identifier identifies the subject so that neither is used during the other's period, stores the identifiers and time period data, and sends the identifiers to the client, "thereby providing anonymity to the first data subject." '215 patent, cl. 1. Every element has a counterpart in *Universal Secure Registry*'s invalidated claim 22. For example, the "time-varying multicharacter code" of *Universal Secure Registry* is the "dynamically-changing, temporally unique identifier" of the asserted patents—both stand in for a person and change over time. "[M]apping" the code "to the identity of the customer" in *Universal Secure Registry* is "associat[ing]" the identifiers "with the first data subject," with the time period data recording when each association holds. And completing the transaction "without obtaining

[2] JPM additionally provides as Appendix A a side-by-side comparison of representative claim 22 at issue in *Universal Secure Registry* and claim 1 of the '215 patent.

knowledge of the customer's identifying information" of *Universal Secure Registry* is "thereby providing anonymity to the first data subject" of the claims.

In its Amended Complaint, Anonos attempts to distinguish claim 22 of *Universal Secure Registry* as a "single-use code verification scheme," pleading that the claimed identifiers instead have a "retained association" with the data subject (as Anonos likewise seeks in its proposed claim construction). Am. Compl. ¶¶ 33, 38, 44; Joint Letter at 3. Anonos's attempted distinction fails because the claims in *Universal Secure Registry* were not limited to single-use codes (the patent describes a time-varying code that "varies slowly"), and there was likewise a "retained association," reflected in the fact that the codes could be "used to access a database" with account-related information to approve or deny a transaction. '539 patent, 13:43–51; *see also id.*, 8:36–40, 11:51–65, 12:13–18; 10 F.4th at 1349. In any event, even if Anonos's distinction were accurate, it would not matter at step one. How long a code stands for a person, and whether and how a trusted party keeps the mapping, are just details of the implementation of the abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018); *Content Extraction*, 776 F.3d at 1347. Accordingly, the Federal Circuit's decision in *Universal Secure Registry* compels a conclusion that the claims here are abstract.

**3. The Claims Recite Functional Results, Not Improvements in Computer Technology**

The claims are also abstract because they recite results, not any concrete technological solution for achieving the results, and do so using the ordinary functions of computers and networks. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) ("[T]he essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101 . . . ."); *GoTV Streaming*, 166 F.4th at 1064 (holding claims that "simply call for the use of computers and networks as tools to carry out an abstract idea, using their ordinary functions," fall on the ineligible side of the line the Federal Circuit has drawn).

The claims are written entirely in the language of results. The processing units "generate or receive" identifiers, but the claim says nothing about *how* an identifier is generated. The units "associate" identifiers with a data subject, but no data structure or method of association is claimed. They "generate . . . time period data," defined only as "information defining a first time period," without any limitation on *how* a period is chosen, measured, or enforced. The four "wherein" clauses state conditions—the periods differ, the identifiers differ, neither identifier is used during the other's period—and the final clause states the desired result, "thereby providing anonymity to the first data subject." '215 patent, cl. 1. The claims are thus entirely functional in nature. A claim that "requires the functional results" of its steps "but does not sufficiently describe *how* to achieve these results in a non-abstract way" is directed to an abstract idea. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017) (emphasis added).

This Court reached the same conclusion on similar claim language in *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327 (E.D. Tex. June 30, 2025). The claims there recited multilevel encryption, and the Court held them abstract because the patent offered "only functional abstraction, not a description of any 'specific technical solution' by which the recursive encryption occurs," did not "provide any specific method of how the bit streams are encrypted," and used "result-based functional language simply [to] describe[] the desired result . . . at a high level of generality and in an abstract way." *Id.* at *5. So too here. The claims recite that identifiers change and that a person is thereby anonymous; they do not recite how an identifier is made, how its period is set, or how its retirement is enforced. *See supra* Section IV.

Nor do the claims purport to improve the operation of a computer. The step one inquiry distinguishes claims focused "on the specific asserted improvement in computer capabilities" from claims directed to "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). The

computer elements the claims recite are generic elements such as "a communication interface for sending data," "one or more memory elements having, stored therein, computer program code," and "one or more processing units" that execute that code, and the only things those elements do are generate, receive, associate, store, and send. *See, e.g.*, '215 patent, cl. 1. Those are the functions of every computer, and the claims do not purport to perform any of them better. The claims use those capabilities as tools to carry out the substitution of codes for identities. *See GoTV Streaming*, 166 F.4th at 1064. Indeed, as explained above, the improvement the specification describes is an improvement in a privacy practice, not one in computing.

*Universal Secure Registry* rejected this same argument. The patentee there contended that using a time-varying code together with intermediaries was "a specific technique that departs from earlier approaches to solve a specific computer problem." 10 F.4th at 1349. The court answered that the patent "uses a combination of conventional components in a conventional way to achieve an expected result" and that its computers were "merely used in a conventional way, rather than a technological improvement to computer functionality itself." *Id.* at 1349–50. The computer functions there—"receiving," "mapping," "determining," "accessing," "providing," and "enabling or denying"—are the same kinds of generic functions the claims here recite.

**4. The Differences in the Claims Do Not Affect the Step One Analysis**

The remaining claims are directed to the same idea. As shown in Section IV.D, the independent claims differ in three respects: whether they are drawn to a system, a device, or a computer readable medium; whether they claim the side of the exchange that issues the codes or the side that requests and returns them; and whether they transmit the identifiers, the attributes associated with an identifier, or both. None changes what the claims are directed to.

Claim 12 of the '215 patent and claim 14 of the '133 patent recite the steps of claim 1 of the same patent on a "non-transitory computer readable medium"; claim 1 of the '133 patent sends

the attributes tied to an identifier rather than the identifier itself; and claims 1, 11, and 21 of the '216 patent recite the client device that requests the identifiers from a "privacy server" and returns them, with their time period data and attributes, when a condition is met. *See* Sections IV.A–C. Each recites the same two or more "dynamically-changing, temporally unique identifiers," the same association of time periods with the identifiers, the same requirement that neither identifier be used during the other's period "thereby providing anonymity," and the same generic interface, memory, and processor. *Id.* They are all, at their core, directed to the same abstract idea.

System and media claims that recite the same idea as a method claim are "no different from the method claims in substance." *Alice*, 573 U.S. at 226–27. A device that requests a code from a privacy server, records when the code stands for a person, and returns the code with its attributes is engaged in the same substitution as the server that issues it, and *Universal Secure Registry* held ineligible both the registry-side claims of the '539 patent and the device-side claims of the '813, '826, and '137 patents, because the claims were "directed to an electronic ID device" that authenticates a user and "generate[s] encrypted authentication information to send to the secure registry." *See Universal Secure Registry*, 10 F.4th at 1348–52. And limiting the idea to a particular kind of data, or to sending one category of stored data rather than another, does not make it less abstract: "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Cap. One Bank*, 792 F.3d at 1366.

The dependent claims, summarized in Sections IV.A–C, recite features of the idea rather than a departure from it. None recites how an identifier is generated, how a time period is enforced, or how any computer function is performed differently. At most, the dependent claims narrow the application of the idea; they do not change what the claims are directed to. *See Content Extraction*, 776 F.3d at 1348–49. Whether any of these limitations supplies an inventive concept is a question for step two, addressed below. At step one, every claim is directed to the same abstract idea.

### 5. Conclusory Allegations and Allegations that Contradict the Challenged Claims Do Not Change the Step One Analysis

The allegations in the Amended Complaint do nothing to change the step one analysis. Anonos cannot plead its way out of ineligibility. The step one inquiry "must focus on" the claim language, not on the patentee's description of it. *ChargePoint*, 920 F.3d at 769. Courts "disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)," and allegations that "just repackage assertions of non-abstractness" do not prevent resolving eligibility as a matter of law. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020). And a court "need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017). The 46 eligibility paragraphs Anonos added all fall into these categories of allegations that do not change the analysis. *See* Am. Compl. ¶¶ 13–58. However Anonos describes them, the claims remain directed to the abstract idea of substituting time-varying codes for a person's identifying information in order to provide anonymity.

Anonos effectively admits that the asserted patents are directed to this abstract idea. It pleads that the asserted patents are directed to "provid[ing] anonymity" and explains that "each identifier is associated with the same data subject; each identifier is tied to its own time period data defining when that identifier is used to identify the data subject; . . . and each identifier is not used to identify the data subject during the other identifier's period." Am. Compl. ¶¶ 17, 41. Those allegations restate the abstract idea, rather than identify any technological means of carrying it out.

Anonos's central argument—that the claimed identifiers differ from the "single-use" codes of *Universal Secure Registry* because they have a "retained association" with the data subject and are stored with time period data, Am. Compl. ¶¶ 16–18, 33, 44—rests on a false premise and, in any event, at most further describes the abstract idea. As to Anonos's premise, it is wrong because

the abstract idea of *Universal Secure Registry* is not limited to single-use codes: nothing in the claims or the Federal Circuit's description suggested, let alone required, that the code be discarded after one use. 10 F.4th at 1349. And Anonos itself pleads that the claims here apply "whether a given identifier is used once or many times within its period." Am. Compl. ¶ 38. Moreover, the "retained association" Anonos pleads does not transform the claims into patent-eligible subject matter. It is no more than a record of which code stood for the person and when: the key or mapping held by a trusted party, which is itself part of the abstract idea. *See* Section V.A.1. Anonos's references to the prosecution history are similarly unavailing. Anonos offers that the asserted patents were allowed over several prior art references, including because "the claimed combination" is distinguishable from "single-use verification codes" and "Verification Security" schemes. Am. Compl. ¶¶ 30, 43. However, distinguishing the claimed invention from prior art does nothing to transform the claimed invention to a non-abstract idea.

Anonos also evidently intends to analogize its claims to those in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), as it repeatedly characterizes its invention as a new "data structure." *See, e.g.*, Am. Compl. ¶¶ 13, 17, 38–42, 48, 52–53. Those allegations contradict the claims, which neither use the phrase "data structure" nor set forth how data is structured in memory using any other words. Anonos's baseless labeling of its invention as a "data structure" is therefore properly disregarded as contrary to the patent itself. *Secured Mail Sols.*, 873 F.3d at 913.

Moreover, however labeled, Anonos cannot point to anything in the claims that parallels what the Federal Circuit held non-abstract in *Enfish*. In that case, the claims at issue recited "means for configuring said memory" and specified a "table" structure, including a particular arrangement of "rows" and "columns," each carrying an "object identification number," which as construed arranged the information in a way that "render[ed] the table self-referential." *Enfish*, 822 F.3d at

1336–37. Accordingly, the asserted improvement was to "the way a computer stores and retrieves data in memory"—*i.e.*, an improvement to how the computer itself functions. *Id.* at 1339. The claims here recite nothing even remotely similar, and instead invoke the conventional storage functions of generic memory elements, instructing to "store, in at least one of the one or more memory elements," the identifiers and the time period data and/or data attributes. *E.g.*, '215 patent, cl. 1. In other words, the claims list things to be stored, but do not recite any structure—no table, row, column, field—and do not even specify an arrangement of the stored items relative to one another. And the tables and figures Anonos points to in its allegations are, as Anonos concedes, unclaimed "examples, not additional claim requirements." Am. Compl. ¶¶ 41–42.

Even crediting Anonos's construction requiring a "retained association linking both identifiers to the data subject," Joint Letter at 3, the claims do not recite any specific data structure and do not even require any data to be stored *with* any other data. To the contrary, the phrase "one or more memory elements" permits the identifiers and other recited data to be stored in different memory elements altogether. And although Anonos alleges that "[s]toring data elements with defined relationships among them is not a generic use of memory," Am. Compl. ¶ 41—pointing to the associations between data subjects and identifiers and the unique time periods in which identifiers can be used—the Federal Circuit disagrees and has declined to extend *Enfish* to claims of this kind. In *BSG Tech*, the claims actually recited a database "with a structure having a plurality of item classifications, parameters, and values," each "independently related" to the others, yet the court held that the "recited database structure . . . provides a generic environment in which the claimed method is performed" and did not constitute "any improvement to the way in which such databases store or organize information analogous to the self-referential table in *Enfish*." 899 F.3d at 1284, 1286, 1288. Thus, Anonos's allegations fail to render the claims non-abstract.

### B. *Alice* Step Two: The Challenged Claims Lack Any Inventive Concept

At step two, courts consider the claim elements both individually and "as an ordered combination" to determine whether they supply an "inventive concept" sufficient to transform the abstract idea into a patent-eligible application. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1314, 1318 (Fed. Cir. 2021). An inventive concept must appear in the claims, must amount to more than "well-understood, routine, conventional activit[ies]," and cannot be the abstract idea itself. *Alice*, 573 U.S. at 225; *ChargePoint*, 920 F.3d at 774. The claims fail each test: they recite generic components performing their ordinary functions; the only thing they add to those components is the abstract idea of a changing code; and Anonos's boilerplate allegation that the claims are "nonconventional" cannot change what the patents themselves disclose.

#### 1. The Claims Recite Generic Components Performing Ordinary Functions

The hardware in these claims is the hardware in every computer. Claim 1 of the '215 patent, for example, recites "a communication interface for sending data," "one or more memory elements having, stored therein, computer program code," and "one or more processing units" that execute that code to "generate or receive" identifiers, "receive a first request," "associate" identifiers with a data subject, "store" data, and "send" it. '215 patent, cl. 1. In *Alice*, the Supreme Court held that a "data processing system" with a "communications controller" and "data storage unit" is "purely functional and generic," because "[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the . . . claims." *Alice*, 573 U.S. at 226. The Federal Circuit has said the same of an "authentication server," "access server," "Internet Protocol network," "client computer device," and "database," *Prism Techs.*, 696 F. App'x at 1017, and of an "interface," "network," and "database," *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016). The "mere recitation of a generic computer cannot

transform a patent-ineligible abstract idea into a patent-eligible invention." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1320 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 223).

The specification confirms that these claims do not recite anything unconventional. It describes the "privacy client" as software that "may be provided as part of a mobile application or operating system running on the mobile device," '215 patent, 36:30–35, and the claimed data privacy operations as facilitated "by means of known programming techniques," *id.*, 57:60–58:6. It describes the identifiers similarly. A DDID may be "a 'cookie' or other unique identifier assigned by a website to a first-time visitor," which the specification acknowledges is "a small piece of data that is generally sent from a website and stored in a Data Subject's web browser." *Id.*, 5:64–6:10. A patent that offers a web cookie as its identifier and known programming techniques on a mobile device as its implementation does not claim an unconventional machine.

**2. Abstract Ideas Cannot Supply the Inventive Concept**

What remains after the generic hardware is the arrangement: a code standing for a person that changes over time, and the person is "thereby" anonymous. That arrangement is the abstract idea itself, and "a claim for a new abstract idea is still an abstract idea." *SAP*, 898 F.3d at 1163 (cleaned up); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016); *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1294 (Fed. Cir. 2024); *Island Intell. Prop. LLC v. TD Ameritrade, Inc.*, No. 2:21-CV-00273-JRG-RSP, 2022 WL 17080738, at *2 (E.D. Tex. Nov. 17, 2022). The specification frames the advance as the replacement of "conventional persistent or static identifiers" with identifiers that change, '215 patent, 36:15–23, but the decision to change a pseudonym rather than keep it is a refinement of the idea of using a pseudonym, not a technical means of implementing one. The claims recite no method of generating the identifiers, no method of choosing or enforcing the time periods, and no mechanism by which an identifier ceases to be used.

*Universal Secure Registry* resolved the same step-two arguments. The plaintiff there identified two candidate inventive concepts, "(1) time-varying codes and (2) sending data to a third-party as opposed to the merchant." 10 F.4th at 1350. The court rejected both. Time-varying codes could not supply an inventive concept because, as "the patent itself acknowledges," generating them "is conventional and long-standing," and routing data to a third party could not because "sending data to a third-party as opposed to the merchant is itself an abstract idea." *Id.* Here, the changing identifier is the time-varying code, and this specification, like that one, identifies conventional embodiments of it—*e.g.*, cookies—rather than a new way of producing it. The functional claim objective of "providing anonymity to the first data subject" is the objective of the idea itself, which "cannot supply an inventive concept." *ChargePoint*, 920 F.3d at 774.

Nor does the added privacy that a changing identifier allegedly provides supply an inventive concept. That is the expected benefit of the technique, not an invention. This Court rejected the same argument in *Torus Ventures*, where the patentee contended that "multiple, nested layers of content protection" made the claims inventive. The Court held, to the contrary, that "nothing show[s] that the combination of these conventional computer functions achieves more than what would be expected from multiple layers of encryption." 2025 WL 1799327, at *7. Greater security, like greater speed or efficiency, is the kind of benefit that follows from applying an abstract idea on a computer, and it does not make the idea patentable. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1330–31 (Fed. Cir. 2020) ("[M]erely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."). The ordered combination here adds nothing. "The claim uses a conventional ordering of steps . . . with conventional technology to achieve its desired result." *Two-Way Media*, 874 F.3d at 1339.

### 3. Anonos's Allegations of Unconventionality Are Unavailing

Anonos cannot plead its way past step two. A patentee's characterization of its invention in its complaint does not displace the claims and the specification, which remain the focus of the inquiry. *Trinity Info*, 72 F.4th at 1365–66; *see also Secured Mail Sols.*, 873 F.3d at 913 ("[A] court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification."); *Dropbox*, 815 F. App'x at 538 (a patentee cannot avoid dismissal under Rule 12(b)(6) purely on the basis of conclusory or generalized statements of inventiveness).

Anonos's allegations are of the conclusory kind. For example, Anonos asserts:

- "Anonos took on the challenge of protecting data while still preserving its usefulness. The result was the development of unconventional, patented solutions to protect data during its actual use." Am. Compl. ¶ 4.
- "Anonos developed and offers for sale its Data Embassy® software enabling Variant Twins®, reflecting Anonos's innovative privacy-enhancing technologies, utilizing advanced pseudonymization and tokenization, and other privacy-enhancing technologies to transform personal data into secure, privacy-respectful outputs, complying with regulations like GDPR, and allowing for data distribution, sharing, and combination without compromising privacy or security." *Id.* ¶ 4.
- "The written description of the '215 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention." *Id.* ¶ 83; *see also id.* ¶¶ 101 (repeated for the '216 patent), 119 (repeated for the '133 patent).

These assertions are boilerplate and do not identify which limitation is unconventional, why, or as compared with what, and paragraph 4 describes Anonos's commercial software rather than any claim. These allegations can therefore be disregarded. *Dropbox*, 815 F. App'x at 538. In any event, the patents contradict such allegations: a specification that embodies the claimed identifier as a website cookie and builds the system with "known programming techniques" cannot be read to describe an unconventional combination. '215 patent, 5:64–6:10, 57:60–58:6.

Anonos also attempts to argue that the claims recite "data structures" and alleges these "data structures" were not "well-understood, routine, and conventional." Setting aside that the allegation contradicts the claims (*see* VV.A.5), Anonos fails to explain the unconventional aspects of the alleged "data structures." Anonos uses the results-oriented language of the patents to claim the allegedly unconventional result of "usable identifiers, each with a retained association with the data subject, that remain usable over time." Am. Compl. ¶ 48(b). Yet Anonos admits that "the claims do not require any particular number of systems," and merely contends the "capability illustrates what the claimed data structure enables." *Id.* Anonos parses through the specification to highlight results that allegedly "improv[ed] upon . . . prior approaches," but Anonos fails to identify any unconventional elements in the claims themselves. *Id.* ¶ 49.

Instead, Anonos implicitly admits the recited elements are conventional. For example, it concedes that the "dependent claims do" recite a cookie, which is "one form in which a claimed identifier may be embodied or carried." *Id.* (citing '215 patent, cl. 27; '216 patent, cls. 8, 18). Anonos further concedes that persistent-identifier systems, "including tracking cookies," were conventional. *Id.* ¶ 48(c); *see id.* ¶ 15 (a tracking cookie "persists for months or years"). And the specification confirms that the claimed cookie is an ordinary website cookie, which serves as a DDID when the browser "prevent[s] any cookie submitted by the website from persisting between browsing sessions." '215 patent, 6:11–18. By Anonos's own account, then, the claimed identifier may be a conventional component.

Anonos's related description of the point of novelty—that the claimed identifiers, unlike single-use codes, have a "retained association" with the data subject that makes them "usable over time" (Am. Compl. ¶¶ 48(b), 52, 54)—is an abstract idea and cannot supply the inventive concept. *See* Section V.B.2. And Anonos concedes that conventional persistent identifiers (*e.g.*, cookies)

were already "usable over time," so that "any system that receives one can recognize the data subject from one interaction to the next." *Id.* ¶ 24; *see also id.* ¶¶ 15, 18, 48(a), 48(c). And it concedes that the time-varying codes of *Universal Secure Registry* were conventional. *Id.* ¶ 52.

Anonos attempts to locate the inventive concept in the "specific combination" of identifiers associated with a data subject, stored time period data for each identifier, and reciprocal non-use. Am. Compl. ¶¶ 53–54. But even by Anonos's own account, that combination simply joins two conventional techniques to obtain the known benefit of each: it "captures the privacy advantage of single-use codes and the usability advantage of persistent identifiers." *Id.* ¶ 17. Anonos's arguments that the "prosecution history shows that combining the two conventional categories did not yield the claimed inventions" do not make the claimed invention any less conventional. *Id.* ¶ 50. That a combination of prior art references did not yield the claimed invention says nothing about the conventionality of the invention—the *Alice* analysis is separate and different from the obviousness or anticipation analyses. The Federal Circuit rejected the same kind of combination in *Universal Secure Registry*, holding that combining "long-standing conventional methods of authentication yields expected results of an additive increase in security." 10 F.4th at 1353. What remains beyond the conventional pieces is a record of which code stood for the person and when, which is the abstract idea itself and "cannot supply the inventive concept." *ChargePoint*, 920 F.3d at 774; *BSG Tech*, 899 F.3d at 1290–91. Nor do the claims recite any unconventional way to achieve the combination. They use generic components to "generate," "associate," "store," and "send," in the order the idea requires. '215 patent, cl. 1; *see Two-Way Media*, 874 F.3d at 1339.

Anonos's allegations describe this combination and its results, not an unconventional implementation of it, so they raise no factual dispute that prevents resolving step two on the pleadings. *See Simio*, 983 F.3d at 1365.

### 4. The Remaining Claims Supply No Inventive Concept

The other independent claims recite the same components and functions on a device or a computer readable medium (or from the client side) (*see* Section IV), but the choice of statutory category or vantage point is not an inventive concept. *Alice*, 573 U.S. at 226–27. Nor do any of the dependent claims add an inventive concept. For example, several dependent claims change the identifier after a set period of time, when the purpose for the identifier expires, or when the data subject's location changes—but those limitations are rules for practicing the abstract idea, not technology for implementing it. Checking whether a request "is authorized" before granting or revoking access is akin to the access-restriction step the Federal Circuit agreed was "non-inventive because [the claims] recite generic computer hardware running generic computer software that performs the abstract functions routine to the process of restricting access." *Prism Techs.*, 696 F. App'x at 1017. Reusing an identifier for another person, attaching data attributes to it, requiring that it "is not derived from" those attributes, or making it a "primary identifier" describe properties of the code, not a means of producing it. And the HTTP cookie of certain dependent claims is, by the specification's own account, a conventional web mechanism. '215 patent, 6:5–10.

Individually and in combination, the asserted claims add to the abstract idea nothing that is not itself abstract or conventional. They fail step two, and they are ineligible under Section 101.

## C. Claim Construction Would Not Affect the *Alice* Analysis

"[C]laim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). "When the court can plainly discern that the claims are directed to an abstract idea performed on a generic device, it need not look beyond the pleadings or develop an evidentiary record regarding the capabilities of those devices generally." *Rothschild Location Techs. LLC v. Geotab USA, Inc.*, No. 6:15-cv-682-RWS-JDL, 2016 WL 3584195, at *3 (E.D. Tex.

Jan. 4, 2016). That is the case here. As explained above, every limitation of the claims states a functional result rather than a technical means, and the only hardware recited is a "communication interface," "memory elements," and "processing units" that generate, receive, associate, store, and send. '215 patent, cl. 1.

Even under Anonos's proposed claim constructions (regardless of whether they are correct), the claims remain ineligible. *See* Joint Letter at 3. As an initial matter, Anonos cannot merely propose constructions. Anonos must "articulate how adoption of the construction would materially impact the analysis at step one (and/or at step two)." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 704 (Fed. Cir. 2023) (affirming dismissal under § 101 without claim construction). Anonos fails to do so, and none of its constructions show that the claimed identifiers are anything other than changing codes substituted for a person's identity. *See* Joint Letter. Anonos's proposed constructions solely repeat steps of the abstract idea, cover generic uses of conventional computer equipment, and repeat definitions already provided in the specification. The proposed constructions fail to provide any further detail on the *how*, and thus claim construction is unnecessary to decide this motion. Indeed, Anonos's construction of the identifiers requires a "retained association linking both identifiers to the data subject," Joint Letter at 3—the very property Anonos concedes conventional cookies already had. *See supra* Section V.B.4. Because the claims are ineligible even under Anonos's proposed constructions, the Court may "proceed by adopting the non-moving party's constructions" for purposes of granting this motion. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

## VI. CONCLUSION

JPM respectfully requests that the Court hold that the claims of the asserted patents are patent ineligible under 35 U.S.C. § 101 and dismiss the Amended Complaint with prejudice.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Benjamin Hershkowitz*
Benjamin Hershkowitz
Katherine Dominguez
Ryan Jin
Danielle Zapata
Vania Wang
Vincent Zhang
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
(212) 351-4000
bhershkowitz@gibsondunn.com
kdominguez@gibsondunn.com
rjin@gibsondunn.com
dzapata@gibsondunn.com
vwang@gibsondunn.com
vzhang@gibsondunn.com

Nathan Curtis
Monica Lin
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Ave., Ste. 2100
Dallas, TX 75201
(214) 698-3400
ncurtis@gibsondunn.com
mlin2@gibsondunn.com

Michael E. Jones
**POTTER MINTON, P.C.**
102 North College, Suite 900
Tyler, TX 75702
(903) 525-2239
mikejones@potterminton.com

*Counsel for Defendant JPMorgan Chase Bank, National Association*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2026, the foregoing was filed electronically in compliance with Local Rule CV-5(a) and served via the Court's CM/ECF on all counsel of record who have consented to electronic service.

*/s/ Benjamin Hershkowitz*
Benjamin Hershkowitz

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S 35 U.S.C. § 101 MOTION PRACTICE ORDER

_____ The parties agree that prior claim construction is not needed to inform the Court's analysis as to patentability.

__X__ The parties disagree on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Benjamin Hershkowitz*
Benjamin Hershkowitz

# Appendix A

| '539 Patent, Claim 22 (held ineligible in *Universal Secure Registry*) | '215 Patent, Claim 1 (asserted)[3] |
|---|---|
| A method for providing information to a provider to enable transactions between the provider and entities who have secure data stored in a secure registry in which each entity is identified by a time-varying multicharacter code, the method comprising: | A system, comprising: |
| | a communication interface for sending data;<br>one or more memory elements having, stored therein, computer program code; and<br>one or more processing units operatively coupled to the one or more memory elements and configured to execute instructions in the computer program code that cause the one or more processing units to: |
| receiving a transaction request including at least the time-varying multicharacter code for an entity on whose behalf a transaction is to take place and an indication of the provider requesting the transaction; | generate or receive two or more dynamically-changing, temporally unique identifiers;<br>receive a first request from a first client for two or more dynamically-changing, temporally unique identifiers related to a first data subject; . . .<br>wherein the first dynamically-changing, temporally unique identifier is different from the second dynamically-changing, temporally unique identifier, |
| mapping the time-varying multicharacter code to an identity of the entity using the time-varying multicharacter code; | associate, in response to the first request, two or more dynamically-changing, temporally unique identifiers with the first data subject; |
| determining compliance with any access restrictions for the provider to secure data of the entity for completing the transaction based at least in part on the indication of the provider and the time-varying multicharacter code of the transaction request; | |

[3] In places, the limitations of claim 1 of the '215 patent are presented below out of order to line up with the steps of the method of claim 22 of the '539 patent.

| ’539 Patent, Claim 22 (held ineligible in *Universal Secure Registry*) | ’215 Patent, Claim 1 (asserted)[3] |
|---|---|
| accessing information of the entity required to perform the transaction based on the determined compliance with any access restrictions for the provider, the information including account identifying information;<br>providing the account identifying information to a third party without providing the account identifying information to the provider to enable or deny the transaction; and | store, in at least one of the one or more memory elements, the two or more dynamically-changing, temporally unique identifiers and the first and second time period data; and<br>send the two or more dynamically-changing, temporally unique identifiers to the first client. |
| enabling or denying the provider to perform the transaction without the provider’s knowledge of the account identifying information. | generate first time period data, wherein the first time period data comprises information defining a first time period during which a first one of the two or more dynamically-changing, temporally unique identifiers associated with the first data subject is used to identify the first data subject;<br>generate second time period data, wherein the second time period data comprises information defining a second time period during which a second one of the two or more dynamically-changing, temporally unique identifiers associated with the first data subject is used to identify the first data subject,<br>wherein the first time period is different from the second time period,<br>wherein the first dynamically-changing, temporally unique identifier is not used to identify the first data subject during the second time period, and<br>wherein the second dynamically-changing, temporally unique identifier is not used to identify the first data subject during the first time period, thereby providing anonymity to the first data subject; |